Argued and submitted May 27, 2009, affirmed January 6, petition for review allowed March 4, 2010 (348 Or 13)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVEN MITCHELL FOSTER,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR060302; A135857

225 P3d 830

Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services, argued the cause for appellant.

Karla Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Deits, Senior Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant, who was convicted of possession of methamphetamine, ORS 475.894, argues on appeal that the trial court erred in denying his motion to suppress evidence found during a warrantless search of his car. In particular, defendant argues that the trial court erred in concluding that probable cause existed to support the search. As explained below, we conclude that the trial court properly denied suppression. Accordingly, we affirm.

■ We state the facts consistently with the trial court's explicit and implicit findings and determine "whether the trial court applied legal principles correctly to those facts." *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993); *see also Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

Officers Ray and Bowdle observed Monk, whom they believed to be a drug user, talking with defendant outside Monk's house. As defendant drove away, the officers stopped his car because defendant was not wearing a seatbelt. Ray was unfamiliar with defendant but, when he looked at defendant's driver's license, he recognized defendant's name as that of the person whom a confidential reliable informant (CRI) had told him two to three weeks earlier was supplying drugs to Monk. A different CRI had provided information six months earlier that defendant was dealing small amounts of methamphetamine. Given his suspicion that drug activity was occurring, Ray summoned another officer, Hulke, and Hulke's drug-detection dog, Benny, to the scene of the traffic stop. As Ray finished writing defendant a ticket, Benny was deployed and alerted to the driver's side door handle. Ray asked defendant if the car contained drugs or related paraphernalia, and defendant said that it did not. Defendant did suggest, however, that Benny could have alerted because a relative might have smoked marijuana in the car earlier. Ray asked for consent to search the car, and defendant refused. Ray observed that defendant appeared nervous. Ray then performed a search of the car, discovering methamphetamine residue in a pipe inside a fanny pack on the seat of the car.

Defendant moved to suppress evidence found during the search, arguing that Ray lacked probable cause to conduct the search.[1] In particular, defendant focused his challenge on Benny, the drug-detection dog, asserting that, because Benny was not properly trained, his alert did not provide probable cause to believe that the car contained drugs. The state presented evidence from Hulke concerning Benny's training and his service records, as well as testimony from another officer, Fyfe, who is a master dog trainer and tests and certifies drug-detection dogs for the Oregon Police Canine Association (OPCA). Defendant presented expert testimony from a chemist, Woodford, who opined that the "play reward" dog training method used by Hulke and the OPCA (and by the majority of law enforcement agencies throughout the United States) is unreliable and lacks scientific validity.

The testimony is described in more detail below, but we briefly summarize it here: Benny and Hulke passed the OPCA test for drug detection, which requires a better than 90 percent accuracy rate during the test. Drug-detection dogs cannot distinguish between a drug scent when drugs are actually present and a drug scent that remains at a location after the drug itself has been removed. Thus, according to Hulke, since Benny generally is deployed only in situations where officers already have "corroborating information" that drug activity has occurred, any time Benny alerts to the presence of drugs in the field, Hulke considers the alert to have been "corroborated" even if drugs are not found, based on his belief that his dog is 100 percent accurate and that, therefore, drugs must have been present at an earlier time. The records of Benny's field work suggest that, of 118 deployments, two alerts had no "corroboration" and 39 additional alerts did not result in the discovery of any drugs. Thus, to the extent that those data are accurate, they suggest that, approximately 66 percent of the time that Benny alerts in the field, drugs are found.

As noted, in response, defendant produced expert testimony from Woodford, who opined that "corroboration" data such as Hulke's were virtually useless, that the "play

---

[1] Defendant does not dispute that, if probable cause existed for the search, the automobile exception to the warrant requirement applies in these circumstances.

reward" system of training drug-detection dogs was inferior to the "food reward/imprinting" method used by certain federal agencies and in other countries, and that the OPCA testing procedure described by Fyfe likely was flawed.

At the suppression hearing, defendant also asserted, and continues to assert on appeal, that Ray's information from the CRIs, obtained approximately six months and three weeks before the stop, was stale and uncorroborated, and therefore contributed little or nothing to the probable cause equation. As noted, Ray testified that, two to three weeks before stopping defendant, he had received a tip from an informant that defendant was supplying methamphetamine to Monk. When asked about the reliability of that informant, Ray testified that the informant had supplied information in the past that had resulted in the successful execution of several search warrants. Ray further indicated that, approximately six months before the stop of defendant, he had received a tip from another informant that defendant was selling small quantities of methamphetamine. Ray testified that he considered that informant to be reliable because that person had performed controlled buys for him and had supplied information resulting in the successful execution of search warrants. On cross-examination, defense counsel asked Ray about the identities of the CRIs, as well as the specific bases for their knowledge of defendant's drug activities, but Ray declined to disclose that information on the ground that it would compromise the CRIs. Ray did testify that the CRI who had provided the more recent tip had reported the location of the drug activity and that the location was not the same place where Ray observed defendant and Monk. Ray further testified that both CRIs had criminal histories and that both provided information to the police in exchange for consideration.

The trial court rejected defendant's arguments that probable cause did not support the search. The trial court stated:

"I also find that Benny, because at this point, let me just talk about Benny. Benny is, Benny alerting, his accuracy record I think leads to the conclusion that it is more likely than not if he alerts there is going to be a presence of drugs.

"* * * * *

"All right. Now I am not, my conclusion is only that Benny is more likely than not, I am not giving any percentage or otherwise. Benny has some hits and some misses.

"I should point out, and I am going to, actually for the officer here, too, I am going to say a few things. But he testified and [it is] uncontroverted that before he brings the dog out, there [is] some collateral evidence. That's what he does.

"So any of these false, I will just call them false positives, I am not sure that's the right way to put it because we don't know whether they are false positives or not. We just don't know. And I will say [to the prosecutor it] is sort of a circular argument that because the dog alerted, there is collateral evidence, so it wasn't, I mean, it is begging the question.

"* * * * *

"Now, would I have found probable cause if there wasn't collateral information? I don't think I have to put this on the record, but the officer is here, I don't think so. I don't think I would. But there was collateral information and collateral evidence and I think strong enough in a, as we say, the four corners of the fact pattern, all the circumstances as testified, given all of that, I do find there was probable cause to do the search."

The court denied the motion to suppress and subsequently defendant was convicted after a trial to the court. On appeal, defendant renews his argument that probable cause did not support the search of his car under the totality of the circumstances.

■ We pause to make a very basic point at the beginning of our analysis. In many of our decisions involving the suppression of evidence, we refer to the term "probable cause." We seldom stop to remark on what that term means because we assume that the meaning is relatively clear. In this case, however, we note that the state appears to be taking the unusual position that "probable cause" in the context of a warrantless search such as the present one means something different from "probable cause" in the context of providing information sufficient for a neutral and detached

magistrate to issue a warrant. In particular, the state appears to assert that, because an inquiry into an officer's probable cause to conduct a warrantless search involves examination of both the officer's subjective belief and whether there is a substantial objective basis for that belief, *see generally State v. Miller,* 345 Or 176, 184-85, 191 P3d 651 (2008), the inquiry is "broader" than in the context of evaluating the sufficiency of information provided in support of a search warrant. To the extent that the state is suggesting that "probable cause" in the context of a warrantless search may be based on less objective information than "probable cause" in the context of a warranted search, the state is incorrect. In the context of justification to arrest a person, " '[p]robable cause' means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." ORS 131.007(11). The same basic paradigm applies to probable cause for a search. A magistrate may issue a search warrant if "there is probable cause to believe that the search will discover things specified in the application and subject to seizure[.]" ORS 133.555. Probable cause exists if facts are shown that would "permit a neutral and detached magistrate to determine that seizable evidence probably would be found at the place to be searched[.]" *State v. Castilleja,* 345 Or 255, 269, 192 P3d 1283, *adh'd to on recons,* 345 Or 471, 198 P3d 937 (2008). "Probably" means "more likely than not." *State v. Chambless,* 111 Or App 76, 80, 824 P2d 1183, *rev den,* 313 Or 210 (1992). Those basic requirements for objective probable cause are equally applicable in the context of warrantless and warranted searches. *See, e.g., State v. Cardell,* 180 Or App 104, 108, 41 P3d 1111 (2002) (setting forth same standards in context of warrantless search); *State v. Getzelman,* 178 Or App 591, 595-96, 39 P3d 195, *rev den,* 334 Or 289 (2002) (same).

■■ It is true that, when evaluating probable cause in the context of a warrantless search or seizure, there is an *additional* inquiry into an officer's subjective belief. In the present case, there is no debate that the arresting officer had the requisite subjective belief that probable cause supported his search of defendant's car. This case solely concerns whether the objective component of probable cause has been satisfied

and, as noted above, that inquiry is focused on whether the facts shown were sufficient to conclude that "seizable evidence probably would be found at the place to be searched." *Castilleja*, 345 Or at 269. Or, stated differently, did the facts demonstrate that it was "more likely than not" that drugs would be found in defendant's car?

■ We first turn to the question of what weight, if any, should be given to the information provided by the two CRIs. Defendant contends that the information should be accorded no weight whatsoever, citing *State v. Poppe*, 131 Or App 14, 883 P2d 905, *rev den*, 320 Or 492 (1994), and *State v. Russell*, 122 Or App 261, 857 P2d 220 (1993), for the proposition that, if an affidavit in support of a warrant does not disclose the basis of an anonymous tipster's knowledge, the information must be struck from the affidavit. Implicit in defendant's argument is the assumption that CRIs, such as those the officer relied on in this case, and anonymous tipsters are treated the same. In *Poppe*, we concluded that an anonymous tipster's information should have been excised from the warrant because "the affidavit establishes *neither* the basis of knowledge *nor* the veracity or reliability of the unnamed informant." 131 Or App at 20 (emphasis added). We reached a similar conclusion in *Russell*, which involved an anonymous letter. 122 Or App at 266. As we stated in *State v. Forker*, 214 Or App 622, 629, 168 P3d 279 (2007), *rev den*, 344 Or 280 (2008), different types of informants are treated differently under the case law:

> "There are different classes of persons who provide information to the police, ranging from unnamed informants to confidential informants, who may be themselves a part of the criminal milieu, to named informants, such as ordinary citizens who are witnesses to or victims of crime. *State v. Villagran*, 294 Or 404, 409-10, 657 P2d 1223 (1983); *State v. Montigue*, 288 Or 359, 363-65, 605 P2d 656, *cert den*, 449 US 846 (1980). Courts view those at the former end of the spectrum with the most suspicion and those at the latter end with the least. *See Villagran*, 294 Or at 409. Thus, when an affidavit is based on information supplied by an unnamed informant, the affidavit must demonstrate the basis for the informant's knowledge and must include facts that establish the informant's veracity. ORS 133.545(4); *State v. Carlile*, 290 Or 161, 164, 619 P2d 1280 (1980). By

contrast, when an affidavit relies on information provided by a named informant, it is not mandatory that the affidavit contain such information. Rather, determining pertinent factors such as reliability and veracity of the named informant are part and parcel of the court's general obligation to * * * determine from the totality of the circumstances whether there is probable cause."

With that general formulation in mind, we turn to what weight, if any, the tips on which Ray relied in forming his subjective belief should be given in the objective probable cause equation. As for the older of the two tips, we agree with defendant that it should be accorded little weight. Although Ray provided testimony about the CRI's reliability and veracity, the tip itself was nonspecific—simply that defendant was selling small quantities of methamphetamine. No purchaser was identified, no location was specified, and no basis for the informant's knowledge was demonstrated. Also, by the time of the search in the present case, the tip was six months old.

■■ The most recent tip, however, is entitled to some weight in the probable cause equation. First, it is clear from Ray's testimony that the informant provided information as to the identities of both participants—defendant and Monk—in a drug transaction and also provided information as to the location of the transaction. Second, although the earlier tip, by itself, did not contribute to probable cause for the challenged search, it did provide some corroboration of the latter tip—as both tips, from different sources, identified defendant as dealing drugs. Finally, the more recent of the tips was only two to three weeks old. Accordingly, we conclude that the newer of the two tips correctly weighs into the probable cause equation. But, given that even that tip was two to three weeks old and was received from a CRI rather than a named informant, it does not weigh heavily in favor of a finding of probable cause. Accordingly, we turn to the central focus of this case—whether the drug detection dog's alert on the door of defendant's car (when considered with other information) provided the necessary probable cause to support a search pursuant to the automobile exception to the warrant requirement.

For the reasons explained below, we conclude that it did. We begin by summarizing the manner in which Benny

(and most drug-detection dogs utilized by local police forces throughout the United States) was trained. According to Hulke and Fyfe, a police officer and master dog trainer who certifies dogs for OPCA, the "play reward" system of training dogs to detect drugs involves pairing a dog with a specific handler. The dogs are trained to detect heroin, cocaine, meth-amphetamine, and marijuana. Initially, the handler exposes the dog to a training aid such as a tennis ball that has been submerged in the drug and familiarizes the dog with the odor by playing with it. Then the trainer hides the ball, and the dog learns to sniff it out. Next, the trainer hides the drug rather than a tennis ball. When the dog finds the drug, it is rewarded by being allowed to play with a favorite toy. After the dog and the handler have worked together for a signifi-cant period of time, they are eligible for testing by the OPCA. As described by Fyfe, the test involves the handler taking the dog through a series of environments such as rooms and vehi-cles. Each environment may have up to three drug packages hidden in it, or may have none at all. The environments also have distractors, such as dirty clothing and urine. The dogs also are required to do a luggage search, for which 100 per-cent accuracy is required. Approximately 25 percent of the dogs fail the test. If a dog passes the test, it is certified for one year and must complete the test again to be recertified.

Defendant provided expert testimony from Woodford, a chemist who had patented a pseudo-scent, methyl benzo-late, which is the scent dogs detect from cocaine. He testified that he has consulted with various federal agencies and the military concerning dogs that are trained to detect drugs and explosives. He indicated that the "highest level" of training involves "imprinting" a dog and using food rewards. This method takes three to four months and involves taking dogs into clean rooms in which cans with odors inside them, including drug odors and distractor odors, are placed on wheels. The dogs do not work with handlers at that point. Eventually, when a dog becomes "imprinted" to alerting to the drug odors, it is ready to work with a handler. Woodford testified that all drug-detection dogs have high rates of false positives, because the scents that they detect in the drugs also are detectable in a number of legal substances, including foods and perfumes. He further testified that dogs trained in

this manner cost $10,000 to $15,000. He concluded that the imprinting method was "generally accepted" as "the scientifically based way to do it."

He criticized the "play reward" system of training dogs, suggesting that simply choosing dogs from an animal shelter (which is where Hulke obtained Benny) was inappropriate, because a psychological profile of a dog should be done before it is selected for imprinting. He suggested that the play-reward system was "okay" and that it works to "a certain extent" but not as well as imprinting, because the incidence of false positives cannot be accurately tracked. He suggested that a major flaw with the play-reward system is that the dog may simply be detecting the scent of the handler who handled the drugs when they were hidden, or may be picking up on subtle cues from the handler, such as changes in heart rate or breathing patterns when the dog is near the place where the handler has hidden the drugs. As for the method used by the OSCA to certify the dogs, Woodford asserted that it likely was flawed because the dog would simply track the scent of the person who placed the drug, which would lead the dog to the drug.

In rebuttal, Fyfe testified that during play-reward testing, a dog's handlers do not place the drugs in the environments. Moreover, the people who do place the drugs in the environments handle the drug packages with gloves and also go to various points in the environments and disturb the environments, so that "our dogs are able to go out there and not alert to skin, crushed grass, disturbed earth where we bury the drug training aid[.]" Fyfe also testified that the play-reward system is the only system in general use in the United States for training drug-detection dogs.

Defendant argues that the evidence described above establishes that the play-reward system in general—and Benny's training in particular—were unreliable because imprinting is the superior method of training drug-detection dogs. Defendant also points out that Hulke's testimony that he considers Benny to have a 100 percent accuracy rate is seriously undermined by all of the other evidence. We agree with defendant that Hulke's testimony that he considers all of Benny's alerts "corroborated," because Benny is deployed

only in situations in which there is some reason to suppose that drugs are or have been present, is unpersuasive and unhelpful. Not only is this view of 100 percent corroboration extremely weak when viewed in isolation, it cannot be reconciled with the uncontradicted evidence from Woodford that dogs cannot distinguish between certain odors that are present in both legal and illegal substances. However, although we agree with defendant that that aspect of the state's evidence is unpersuasive, and we agree with defendant that the scientific community may view the imprinting method of dog training more favorably than the play-reward method, we do not agree with defendant's conclusion that the arguably better method of training a drug-detection dog is the *only* method that is sufficiently reliable to support a finding that probable cause exists to justify a search. As noted above, the probable cause standard simply requires that a consequence be "more likely than not," *Chambless*, 111 Or App at 80, it does not require that something be established using only the best available evidence.

In particular, we note that two aspects of the state's evidence strongly suggest that, for the purpose at issue here, Benny is adequately trained to detect drugs. First, and disregarding Hulke's testimony concerning what he considers to be corroboration in approximately two-thirds of the instances that Benny has alerted when he has been deployed in the field, drugs were discovered at the location where he alerted. Second, Benny passed the OPCA certification test, which required a 90 percent accuracy rate. Moreover, the state presented evidence rebutting Woodford's critique of the OPCA certification test. As discussed, Woodford suggested that handlers might be cueing the dogs about where the drugs were located or that the dogs might be following human scent to the location where the human placed the drugs. Fyfe testified, however, that handlers did not place the drugs for the test or know where the drugs were located, that the people who placed the drugs wore gloves, and also that the people who placed the drugs went to numerous areas in the environment so that the dogs would not simply go to the place that had most recently been disturbed. Given that evidence—in addition to the undisputed evidence by both parties that dogs do, in fact, have superior abilities to detect odors and can be

trained to alert to specific odors—we agree with the trial court that the evidence of Benny's alert to defendant's car door handle, when combined with other evidence,[2] provided sufficient probable cause for the search at issue here.

We conclude that the trial court properly denied defendant's motion to suppress evidence obtained as a result of the search of defendant's vehicle.

Affirmed.

---

[2] The other evidence, we reiterate, included a tip from a CRI implicating defendant in drug dealing; defendant's nervousness during the stop; and defendant's suggestion, in response to the dog's alert, that a relative might have smoked marijuana in the car.