Submitted April 29, affirmed November 9, 2011, petition for review denied March 8, 2012 (351 Or 649)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL ANTHONY ULIZZI,
*Defendant-Appellant.*

Jackson County Circuit Court
081845FE
A142640

266 P3d 139

Peter Gartlan, Chief Defender, and Eric Johansen, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Douglas F. Zier, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Edmonds, Senior Judge.

HASELTON, P. J.

Edmonds, S. J., concurring.

**HASELTON, P. J.**

Defendant, who entered a conditional plea of guilty, ORS 135.335(3), for possession of a controlled substance (marijuana), ORS 475.864, appeals the resulting judgment. He assigns error to the denial of his motion to suppress evidence obtained during a search of his residence pursuant to a warrant. Defendant contends, specifically, that essential averments of the affidavit on which the warrant was predicated were "stale" and, thus, the affidavit did not establish probable cause. As amplified below, we conclude, consistently with the standard of review prescribed and amplified in *State v. Castilleja*, 345 Or 255, 264-66, 192 P3d 1283, *adh'd to on recons*, 345 Or 473, 198 P3d 937 (2008), that the magistrate did not err in issuing the search warrant. Accordingly, we affirm.

The facts material to our review are undisputed. On February 8, 2008, members of the Jackson County Narcotics Enforcement Team (JACNET) executed a warrant to search defendant's residence in Ashland and discovered evidence of marijuana cultivation, including four growing marijuana plants and two grow lights, as well as various implements. The warrant was, in turn, based on an application, including an affidavit by Jackson County Sheriff's Detective Donald Adams, which Adams had written and submitted earlier that day.

In his affidavit, Adams recounted the following circumstances: On January 27, 2008, 11 days before the search warrant issued and was executed, defendant's former companion, Ammann, had sent a "computer generated complaint" to JACNET about a "possible marijuana growing operation" at defendant's residence. Ammann reported that she and defendant had two children, 11-year-old twins, E and M, who sometimes stayed at defendant's residence. According to Ammann, her son, E, had told her "about a month ago" that he had seen marijuana plants and "grow lights"[1] in a shed at defendant's residence.

---

[1] As described below, *see* 246 Or App at 433, when Adams subsequently spoke to E, E clarified that he had seen only a single "heat lamp."

On January 31, responding to that complaint, Adams interviewed Ammann and both E and M. Ammann told Adams that she and defendant had lived together in the mid-1990s and that she had suspected during that time that defendant might be dealing marijuana because he used marijuana and he "would have several people over to the house for short periods of time." Although defendant always denied engaging in drug activity, while Ammann was pregnant with the twins, she found "a large amount of marijuana and money in the residence." She broke off her relationship with defendant within a year of that discovery—somewhere between 11 and 12 years before the search at issue here.

E told Adams that his younger half-brother had taken him to a shed at defendant's residence and inside he had seen "at least three plants and a heat lamp." E, who was "very sure" that the plants were marijuana plants,[2] did not describe the size or development of the plants he saw.

M told Adams that she had not seen marijuana at defendant's house "but did know kind of what it smells like" from having once smelled what her mother told her was marijuana smoke—and that "she has smelled [that] different [from cigarette smoke] smell" at defendant's residence.[3] However, M did not specify when that had occurred. M also told Adams that sometimes, "while at [defendant's] house[,] some people will come in and go into [defendant's] bedroom with [defendant]" and that "the people would sometimes be in there for a while, and at times * * * would come out in just a short period of time." M said that she would go into her father's bedroom "only to brush her teeth" and that, before she did so, "[defendant] goes in first[,] shuts the door, and she can hear what sounds like glasses being put up."

In the affidavit, Adams also recounted that he had confirmed with the Department of Human Services that

_____

[2] Ammann had educated both E and M about the appearance of marijuana, including showing them photographs and videos about drug awareness. In addition, E identified the lamp that he saw as a "heat lamp" from photographs Adams showed him. Defendant does not challenge E's identification of those items as unreliable.

[3] Although Ammann's computerized complaint stated that her twin children were 11 years old, Adams's affidavit states that M was 12. The affidavit does not explain that apparent inconsistency.

defendant did not have a medical marijuana card and that a records check had disclosed that, in 2004, defendant had been arrested and charged with endangering the welfare of a child and possession of less than an ounce of marijuana.[4]

Finally, in the balance of his affidavit, Adams included averments based on his training and experience in drug-enforcement efforts. Many of those averments pertained to common practices by persons engaged in outdoor cultivation of marijuana at "remote" sites. For example, Adams stated that "an outdoor marijuana grow takes approximately three months" and that "[o]ften the marijuana seeds are germinated indoors, within the drug trafficker's residence or other buildings on the premises." Adams's affidavit did not include any information about the growing cycle of an indoor marijuana cultivation operation. In addition, Adams included more general averments pertaining to people who "sell and possess controlled substances," including that such persons "often keep their controlled substances, [transactional] records and paraphernalia in[, *inter alia*,] their residences and in outbuildings." Adams stated that the execution of prior search warrants involving other persons had yielded not only marijuana plants and transactional records but also a variety of durable implements and equipment, including fans, timers, and myriad heating and lighting systems.[5] Adams's averments in that regard are similar to those typically made in connection with investigations of commercial controlled substance manufacture and distribution operations.

As noted, based on Adams's affidavit, the court issued a search warrant on February 8, which was executed later the same day, yielding inculpatory evidence. Defendant

---

[4] Adams's affidavit does not refer to any convictions on those charges.

[5] Adams did not include in his affidavit any training and experience-based representations regarding the likelihood of a purported marijuana grower's "maintain[ance of] a continuous supply of plants," *State v. Duarte/Knull-Dunagan*, 237 Or App 13, 25, 238 P3d 411, *rev den*, 349 Or 370 (2010), or the likelihood of retention over time of grow-related equipment. *Cf. id.* (rejecting "staleness" challenge to warranted search where affidavit in support of warrant application stated, in part, that the "equipment used in the manufacture of marijuana plants is expensive and is normally used for more than one initial grow operation" and "[t]he equipment is not normally thrown away after being used to grow marijuana based on the grower's capital investment" (internal quotation marks omitted)).

was charged with, as pertinent here, possession of a controlled substance (marijuana).

Thereafter, he filed a motion to suppress the evidence obtained during the warranted search, as well as derivative evidence. The gravamen of defendant's position, as expressed by his counsel during the hearing on the suppression motion, was as follows:

"In this case, you have six weeks between the sighting of three marijuana plants and [the] search warrant affidavit. We're not talking about a large scale grow. The child [E] thinks it's three plants. There's nothing in the affidavit [that] would allow the magistrate to conclude that the evidence would still be there six weeks later. In fact * * * although there's something in the affidavit talking about the length of an outdoor grow cycle, this is an indoor situation, and there's nothing in [the] affidavit talking about the length of the indoor grow cycle. There's no information where in the cycle the plants were at the time of this reported sighting. So we don't know if they're huge and harvested, if they're tiny and moved; there is just not sufficient information * * * to let a magistrate conclude that they would still be there.

"* * * * *

"* * * [I]n the affidavit in this case, the detective is discussing commercial drug type offenses, and there's no evidence that that's what we're dealing with for [defendant]. It doesn't—it doesn't apply to him. There's stuff about people who possess large quantities of marijuana. Well there's nothing in the affidavit that would let the magistrate conclude that he possessed a large quantity of marijuana. There's information about drug trafficker[s]. There's nothing in the affidavit that would allow the magistrate to conclude that he's a drug trafficker. * * *

"* * * I don't think the State can say, we have three marijuana plants, therefore it's a commercial operation. And in commercial operations we expect to find all this [paraphernalia and equipment]. * * * [That is,] [i]f it was commercial, somehow that means that there's probable cause to believe these durable items are going to be there in [defendant's] situation. I just—I don't think it's there[.]

"The only durable item that was described in the affidavit was some sort of lamp[.] * * * [T]he only thing [in this case] that the Court could reasonably conclude would be there, would be—that's durable, would be this heat lamp, that might be there. And that, in and of itself, is not evidence of any crime[.]"

Thus, in moving to suppress, defendant argued only that there was no probable cause to believe that *any* inculpatory evidence could still be found at defendant's residence, given the interval of roughly six weeks between E's observations (a month before Ammann's initial report on January 28) and the issuance and execution of the search warrant 11 days later on February 8. In that regard, defendant's sole argument regarding the grow light that E had seen was that that light "in and of itself is not evidence of any crime." Defendant did not argue alternatively that, even if a magistrate could reasonably infer that the grow light that E saw at defendant's residence would still be there six weeks later, the lapse of time rendered it improbable that the marijuana plants would still be there—and thus, at least, even if there was probable cause to search for the former, the latter should be suppressed.

The trial court, after noting correctly that "we are to give deference to the search warrant process," rejected defendant's staleness argument. In doing so, the court referred to E's observation of the heat lamp and reasoned:

"[T]here was probable cause justifying the issuance of the search warrant. * * * I think that there is an issue on the growing; whether it's growing, whether it's going to be there a longer period of time. And that also that contrary to counsel's indication that grow lamps aren't evidence, I think they are evidence of manufacture. And I think that if you have an indoor grow, you figure there's going to be others there, that there's probably going to be some watering system, or something. There's going to be other things that are going to be evidence of this crime.

"So, I think that the [magistrate] did[,] in fact, appropriately issue the search warrant based upon the affidavit that the information contained in there was not so stale that they would not expect to find evidence of the crime of marijuana at that location."

On appeal, defendant reiterates his arguments in support of suppression. In assessing those arguments, we employ the standard of review prescribed in *Castilleja*, 345 Or at 264-66. In *State v. Duarte/Knull-Dunagan*, 237 Or App 13, 21-22, 238 P3d 411, *rev den*, 349 Or 370 (2010), we summarized that standard:

> "[W]hen a defendant seeks to suppress evidence from a search authorized by warrant, contending that the information in the predicate warrant did not establish probable cause, the court's function is limited to determining whether, given the uncontroverted facts in the affidavit and reasonably derived inferences, the issuing magistrate reasonably 'could have concluded that the affidavit (excluding the excised parts) established probable cause to search * * *.' [*Castilleja*, 345 Or] at 265. That is so regardless of whether the reviewing court—whether a trial court, this court, or the Supreme Court—might have drawn different inferences yielding a different determination.
>
> "Further, in exercising that discrete review function, the court is to view the predicate affidavit in a 'common-sense, nontechnical and realistic fashion,' with 'doubtful cases * * * to be resolved by deferring to an issuing magistrate's determination of probable cause.' *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001) (internal quotation marks omitted). That deferential standard comports with 'the preference for warranted searches over those conducted without prior judicial authorization.' *Id*."

Applying that standard, we conclude that the issuing magistrate could reasonably infer that, notwithstanding the interval of six weeks, it was probable that some inculpatory evidence of unlawful marijuana cultivation—specifically, the heat lamp that E observed with the marijuana plants—could still be found at defendant's residence. Accordingly, the trial court correctly denied suppression.

Defendant's argument to the contrary is, as noted, predicated on notions of "staleness." In *State v. Young*, 108 Or App 196, 204, 816 P2d 612 (1991), *rev den*, 314 Or 392 (1992), we summarized the essential principles:

> "Of course, information is never stale; that phrase is a shorthand description of the analysis about whether or not the evidence sought will be there after the length of time

since the event described in the affidavit occurred. The purpose of the analysis is to determine whether, given the time between the event described and issuance of the warrant, there is a reasonable inference that the evidence will be where the affidavit suggests."

In explaining and addressing whether the passage of time precludes probable cause, we have identified and applied a variety of considerations. *See generally State v. Kirkpatrick*, 45 Or App 899, 903, 609 P2d 433, *rev den*, 289 Or 337 (1980) ("The question of whether the lapse of time involved is too long to justify a finding of probable cause depends upon all the circumstances."). Specifically, we and the Supreme Court have considered the following factors:

(1) the length of time (a factor that is addressed in all discussions of "staleness" by Oregon courts);

(2) the "perishability" versus the durability of the putative item, *compare, e.g., State v. Henderson*, 341 Or 219, 225, 142 P3d 58 (2006) (noting that two stolen diamond rings were "nonperishable items of high value" in rejecting staleness challenge), *with State v. Corpus-Ruiz*, 127 Or App 666, 670, 874 P2d 90 (1994) (reversing denial of suppression based, in part, on determination that informant's statements pertaining to a heroin transaction six months earlier were impermissibly stale because "[h]eroin is a substance that has a relatively long shelf life, but can be consumed in a short period of time and is easily moved");

(3) the mobility of the putative evidence, *see, e.g., Corpus-Ruiz*, 127 Or App at 670; *State v. Bice*, 115 Or App 482, 485-86, 839 P2d 244 (1992), *rev den*, 315 Or 312 (1993) (reversing suppression of evidence of residential marijuana growing operation because detailed information about the operation was not rendered "stale" by the passage of two months, but noting that "[t]he information was not about a quantity of marijuana that may be consumed or moved, but about a marijuana growing operation");

(4) the nonexplicitly inculpatory character of the putative evidence, *see, e.g., Kirkpatrick*, 45 Or App at 902-03 (reversing allowance of suppression and rejecting staleness argument based on interval of at least one year between the

defendant's display of sexually explicit pictures to child complainants and the issuance of search warrant for those pictures, noting, in part, that "the photographs for which the warrant was issued were not illegal in themselves," supporting a reasonable inference that the defendant would have retained those photographs); *State v. Veley*, 37 Or App 235, 238, 586 P2d 1130 (1978), *rev den*, 285 Or 1 (1979) (reversing suppression of fruits of warranted search in a prosecution for contributing to the sexual delinquency of a minor where the warrant issued approximately 90 days after the purported conduct; noting that condoms, which were one of the items identified in the warrant, "are not contraband, but rather articles the continued possession of which is not illegal or unlikely"); and

(5) the propensity of an individual suspect or general class of offenders to maintain and retain possession of such evidence, *see, e.g.*, *State v. Daniels*, 234 Or App 533, 539-43, 228 P3d 695, *rev den*, 349 Or 171 (2010) (addressing sufficiency of affiant officer's "training and experience"-based averments regarding pedophiles' purported retention of sexually explicit material over a period of several years).

Applying those considerations here, as pertinent, we have no difficulty in concluding that Adams's affidavit, reviewed consistently with *Castilleja*, did not establish probable cause to search for marijuana, including growing marijuana plants, at defendant's residence. That is so for two related, but distinct, reasons. First, as to the three plants that E observed six weeks before the issuance of the warrant, Adams's affidavit provided no information as to the maturity of those plants, the typical indoor growth cycle for marijuana plants, or the projected yield from such plants, which, arguably, could pertain to the likelihood that harvested marijuana would still be in defendant's possession. *Compare, e.g.*, *Young*, 108 Or App at 198 (noting confidential informant's statement that he had seen "rows of plants with lots of 'bud' on them"), *and id.* at 205 (noting affiant officer's statement that, with respect to indoor marijuana growing operation, it "takes months of cultivation before a marijuana plant produces buds"). Further, similarly to the heroin in *Corpus-Ruiz*, marijuana plants, at least in small numbers, are eminently perishable—or, when harvested, consumable—and mobile.

*Cf. Bice*, 115 Or App at 485 (noting that the supposedly stale information "was not about a quantity of marijuana that may be consumed or moved"). Nothing in the affidavit provides any basis to determine that those plants that E saw probably were still in defendant's possession six weeks later.

Second, Adams's affidavit did not include facts from which a magistrate could reasonably infer and find that defendant was involved in a continuing cultivation operation, of the sort that we addressed in, *e.g.*, *Duarte/Knull-Dunagan*, *Bice*, or *Young*, so that it was probable that other plants could be found at defendant's residence. *See Duarte/Knull-Dunagan*, 237 Or App at 22-23, 25 (noting that search warrant affidavit included information about purported hydroponic marijuana growing operation in the basement of the defendants' residence, including evidence of structural modifications of the basement and substantial increases in the defendants' water and electrical consumption; further noting officer affiant's averment that persons engaged in indoor marijuana growing operations "maintain a continuous supply of plants," so as to ensure "an ongoing and uninterrupted source of marijuana for harvest and sale" (internal quotation marks omitted)); *Bice*, 115 Or App at 484-85 (warrant affidavit included informant's description of observations, two months before, of, *inter alia*, a closet in the defendant's home having been converted for marijuana growing operation, with "several ounces to pounds of marijuana being dried" (internal quotation marks omitted)). There was no evidence of defendant's use or possession of marijuana in the intervening six weeks.[6] There was no evidence that, with the exception of the single heat lamp, defendant possessed any of the materials and implements necessary for a continuing indoor marijuana cultivation enterprise. Finally, there was no nonspeculative evidence as to any distribution activity; although M described visitors going into her father's bedroom for varying lengths of time, she (apparently) did not witness or overhear conversations about any transactions or see any marijuana in defendant's bedroom or otherwise in his possession.

---

[6] As noted, 246 Or App at 433, M's statement about smelling the "different smell," which she believed was marijuana smoke, did not identify when that had occurred.

The staleness analysis with respect to the heat lamp stands in stark contrast to that for marijuana, including growing marijuana plants. Indeed, as defense counsel implicitly acknowledged at the suppression hearing, *see* 246 Or App at 436, the issuing magistrate "could reasonably conclude" that the heat lamp "might be there" (*viz.*, at defendant's residence). The heat lamp is durable, not "perishable" or "consumable." It is not inculpatory *per se*, so defendant would have had no obvious or compelling motivation to discard it, move it, or transfer it to a third person in the intervening six weeks. Although Adams here, unlike the officer affiant in *Duarte/Knull-Dunagan*, 237 Or App at 25, offered no "training and experience"-based averment regarding the likelihood of retention of that item, given the relatively brief interval of several weeks and the nature of the item, we conclude, consistently with *Castilleja*'s standard of review, that the magistrate could determine that there was probable cause with respect to the heat lamp. *Cf. Daniels*, 234 Or App at 541-42 (noting that some "common[sensical]" propositions "need not be justified by *any* reference to training and experience" (emphasis in original)).

As noted, 246 Or App at 436, defendant's sole response regarding the heat lamp was, and is, that the heat lamp was not "in and of itself" evidence of any crime. With due respect, that is a *non sequitur*. The fact that an item is not explicitly inculpatory does not mean that it is not evidence of a crime properly subject to a search warrant. *See, e.g.*, *Kirkpatrick*, 45 Or App at 903 (noting that sexually explicit photographs that were the object of the search warrant, and which the defendant allegedly showed the child complainants, "were not illegal in themselves"); *Veley*, 37 Or App at 238 (condoms that were among the items identified in warrant to search for evidence of contributing to the sexual delinquency of a minor were themselves "not contraband, but rather articles the continued possession of which is not illegal or unlikely"). Specifically, here, the heat lamp, if discovered in defendant's possession, would, or could, corroborate E's account of seeing the three marijuana plants and the heat lamp, even if the plants no longer existed. Thus, the heat lamp was evidence of criminal activity, and the magistrate, in issuing the warrant, could properly determine that there

was probable cause to believe that the lamp was still at defendant's residence.

That conclusion, in turn, returns us to the precise nature of defendant's argument to the trial court (and renewed on appeal) in support of his suppression motion. As set out above, 246 Or App at 436, defendant argued that Adams's affidavit did not establish probable cause that any evidence of unlawful manufacture, possession, or delivery of controlled substances could be found at defendant's residence, because of two *conjunctive* reasons: (1) The passage of time—and the lack of evidence of an ongoing operation—rendered the likelihood of finding marijuana, including growing plants, improbable; *and* (2) the heat lamp that E saw was not "in and of itself" evidence of a crime. Defendant never contended before the trial court, and has never asserted on appeal, that, regardless of the correctness of the second proposition, suppression of the marijuana plants was nevertheless required because Adams's affidavit failed to establish probable cause to search for and seize *that* evidence.

Our deconstruction of defendant's argument is not some mere academic exercise, some form-over-substance endeavor to "slice[ ] too thinly" the "preservation onion." *State v. Amaya*, 336 Or 616, 629, 89 P3d 1163 (2004). Rather, it implicates, and partakes of, very real practical concerns. If, for example, defendant had advanced such an alternative argument before the trial court, it is entirely possible that the state would have responded—and could have shown—that the marijuana plants would inevitably have been discovered, in plain view, during the lawfully authorized search for the heat lamp. Further, as recounted above, *see* 246 Or App at 436, the trial court's ruling on the suppression motion was based substantially—and, apparently, disjunctively—on its rejection of defendant's erroneous premise that the heat lamp was not "evidence of a crime." Even at that point, defendant did not assert, or clarify, that he was seeking to advance some sort of alternative analysis.

In sum, the trial court, in denying defendant's motion to suppress, correctly concluded that the magistrate

could have found that evidence of unlawful possession, manufacture, or delivery of marijuana could be found at defendant's residence.

Affirmed.

**EDMONDS, S. J.,** concurring.

I write separately in this case because I would hold that the trial court correctly concluded that the affidavit provided probable cause for a reasonable magistrate to issue a search warrant for the search of defendant's residence for evidence of the manufacture of marijuana.

Some general rules provide the legal framework for my conclusion. ORS 133.545(4) provides, in part, that an application for a search warrant "shall be supported by one or more affidavits particularly setting forth the facts and circumstances tending to show that the objects of the search are in the places, or in the possession of the individuals, to be searched." Probable cause to issue a search warrant "exists when the facts set out in the affidavit would lead a reasonable person to believe that seizable things will probably be found in the location to be searched." *State v. Castilleja*, 345 Or 255, 264, 192 P3d 1283 (2008) (internal quotation marks and citations omitted).

> "A reviewing court asks whether, based on the facts shown by the affidavit, a neutral and detached magistrate could conclude (1) that there is reason to believe that the facts stated are true; and (2) that the facts and circumstances disclosed by the affidavit are sufficient to establish probable cause to justify the search requested."

*Id.* Reviewing courts "are to construe the supporting affidavit in a commonsense and realistic fashion." *State v. Villagran,* 294 Or 404, 408, 657 P2d 1223 (1983). "Thus, to uphold the warrant, the reviewing court need only conclude that the issuing magistrate reasonably could conclude that the facts alleged, together with the reasonable inferences that fairly may be drawn from those facts, establish that seizable things *probably* will be found at the location to be searched." *Castilleja,* 345 Or at 270-71 (emphasis in original).

I would hold in this case that the issuing magistrate reasonably could have concluded that evidence of growing marijuana could be found at defendant's residence at the

time of the issuance of the search warrant. Defendant argues that "[t]he information in the affidavit was stale because there was a six week period of time between the sighting of the three marijuana plants and a grow lamp and the preparation of the affidavit." When a defendant argues that the information in an affidavit is "stale," that argument is essentially an argument that the affidavit fails to demonstrate that it is probable that the items sought under the warrant are still at the location to be searched at the time that the application for the warrant is made. However, when an affidavit provides a reasonable inference that the location to be searched is a place of drug production or manufacture, it is reasonable to infer from those facts that the operation is ongoing and that evidence of drugs and drug-manufacturing equipment are likely to be found there. *See, e.g., State v. Wilson,* 120 Or App 382, 387, 852 P2d 910, *rev den,* 317 Or 584 (1993) (affidavit information held not stale when an affiant spoke with an unnamed informant on March 5, 1990, regarding an allegation that a drug operation had occurred during the previous seven to eight months at a residence and an application for a warrant was made on April 23, 1990).

In this case, Detective Adams made an application for a search of defendant's premises on February 8, 2008. In support of that application, Adams submitted an affidavit that contained the following information that is pertinent to the issue of "staleness":

"On 01-27-08, Lisa Ammann made a computer generated complaint to JACNET regarding a possible marijuana growing operation in an out building at [defendant's residence].

"Lisa Ammann reported [that, defendant,] the father of her twin son and daughter[,] * * * lives at [the specified] address. Lisa stated that their twelve year old son [E] told her (Lisa) he saw marijuana plants approximately one month ago in the shed belonging to [defendant]. Lisa advised she has told her children if they ever see marijuana at their father's house, they are to let her know.

"Lisa reported that she was told by [E] that he had seen the marijuana plants and growing lights when she picked him up about one month ago. [E] pointed out the shed in which the marijuana was growing. Lisa's report indicated

that she did not come forward sooner due to a fear of [defendant] and that her son asked her not to tell on his dad."

According to his affidavit, Adams thereafter contacted Ammann, her son, E, and her daughter, M, on January 31, 2008. Adams averred that on that occasion E told him that "he saw what he thinks is at least three plants and a heat lamp." E was "very sure" that the plants were marijuana plants. Ammann also told Adams that E had pointed out to her the shed in which he had observed the plants and the grow lights.

Adams also interviewed M. According to his affidavit,

"[M] also told me that while at her dad's house some people will come in and go into his bedroom with her dad. She told me the people would sometimes be in there for a while, and at times would come out in just a short period of time. I asked [M] if she goes into her dad[']s room, and she said 'only to brush her teeth.' [M] said [that] when they do have to go into brush their teeth, their dad goes in first[,] shuts the door, and she can hear what sounds like glasses being put up. Shortly after hearing these sounds, her dad would let them brush their teeth."

The police executed the search warrant on February 8, 2008, and found four growing marijuana plants, two lights, and other drugs and drug-manufacturing objects. All of the information in the affidavit pertinent to the issue of probable cause occurred within a period that does not exceed 42 days— approximately a month lapsed between when E told Ammann that he had seen marijuana plants and when she made her initial report to the police, and the issuance of the search warrant occurred within 12 days thereafter.

Consequently, the proper focus is on the totality of the circumstances that occur within the time period in light of the information contained within the four corners of the affidavit. It may be that a single fact in the affidavit, by itself, is insufficient to afford probable cause. However, the proper test requires us to assess the cumulative effect of all relative facts. Those facts include E's observation of growing marijuana plants and growing lights, the information that M gave to the police, and the affiant's experience and training

regarding seizure of marijuana-growing operations. In addition, the state is entitled to the benefit of every reasonable inference that flows from those facts.

For the reasons that follow, I disagree with the majority's conclusions that a reasonable magistrate could not infer that it was more likely than not that *evidence* of growing marijuana plants could be in defendant's possession on February 8, 2008. I further disagree with the majority's conclusion with regard to whether defendant was involved in a continuing cultivation operation. To begin with, this case is, for purposes of reasonable inferences that can be drawn from the core facts, a cultivation case and not a possession case. In light of the fact that E observed *growing* marijuana plants and grow lights, a maximum of 42 days between E's observation and the execution of the warrant is a relatively short period of time when the illegal cultivation of plants is the subject of the investigation. Also, cultivation cases, by their nature, give rise to an inference of ongoing activity over a period of time because it is ordinarily expected that the process of growing plants requires preparation of plant beds, planting, cultivating, and harvesting. Indeed, it is reasonably inferable from the nature of the cultivation process itself that some evidence of the cultivation process may remain in the place of cultivation for a significant period of time after harvest occurs. Adams's affidavit supports those inferences. He averred in his affidavit that, in his experience, "illegal cultivation and distribution of controlled substances, such as marijuana, is frequently a continuing activity over months and years." This combination of facts and inferences is all part of the legal equation for probable cause in this case.

Additionally, Adams stated in his affidavit, "With respect to marijuana cultivation, I am aware that an outdoor marijuana grow takes approximately three months (ninety-days) from the time the marijuana plant is planted in the soil until it is cultivated at the end of its season." The majority is not persuaded by that averment because this growing operation occurred indoors. One would ordinarily expect that plants grown under grow lights could mature more quickly if they are subject to a more continual light and heat source than plants grown outdoors, but the growth rate of particular plants depends necessarily on the extent to which the grow

lights are actually used. Adams's averment is not without relevance. It defines for purposes of the affidavit an inferential timeline for the ordinary growth cycle of a marijuana plant. Its importance to the issue in this case is that it demonstrates by comparison, albeit inexact, the relatively short 42-day time period within which E's observation and the execution of the search warrant occurred.[1] Finally, the inference from M's observations of the activities connected with her father's bedroom is a relevant consideration. First, M's report does not suggest that the activities she described happened only on one occasion. Rather, they imply reoccurring activities, *i.e.*, "people would sometimes be in there for a while, and at times would come out in just a short period of time." Moreover, statements regarding her father's practice of not permitting her to brush her teeth without first entering the room and shutting the door further reinforce the inference that his actions to hide certain contents in the room occurred on more than one occasion. It is correct that nothing in the affidavit expressly ties these observations to the 42-day time period, but nothing in their nature excludes them from that time period either. Because those activities appear to be in the nature of habitual practices, they are inferentially further evidence of ongoing drug activity on the part of defendant.

In sum, the assessment of the sufficiency of an affidavit to determine whether it provides probable cause to search is a "four corners" analysis that must take into account the totality of the circumstances found by the magistrate to be true. Here, defendant does not contravene any of Adams's averments. The remaining question is whether those facts and the reasonable inferences available from them, when considered in combination with each other, make it more likely than not that evidence of marijuana cultivation would be found on defendant's premises on the date of the issuance of the search warrant. The issuing magistrate may or may not have drawn the above inferences or other inferences in support of his determination of probable cause. The

---

[1] Again, in assessing the weight to be given that inference along with other available inferences, it is important to be mindful that the standard of review is not what weight I or the majority would give to a particular inference if we were the issuing magistrate, but what weight a magistrate would be legally entitled to give to it.

point is that he reasonably could have drawn the above inferences, and that conclusion suffices to satisfy the standard of review imposed by *Castilleja*.[2]

For these reasons, I would reach the same result as the majority but based on different reasoning.

---

[2] The majority reaches the same conclusion based solely on the observation of the grow light. My quarrel with the majority is not its lack of reliance on that fact but on its failure to rely on the other facts in the affidavit in combination with that fact.