JAMES, J.
*904 Defendant appeals a judgment of conviction for unlawful manufacture of marijuana, former ORS 475.856, repealed by Or. Laws 2017, ch. 21, § 126; unlawful possession of heroin, ORS 475.854 ; and unlawful possession of a short-barreled firearm, ORS 166.272, assigning error to the trial court's denial of his motion to suppress evidence obtained during the execution of a warrant to search his residence for evidence related to the crimes of delivery of heroin, ORS 475.850, and frequenting a place where controlled substances are used, ORS 167.222. Defendant argues that the affidavit submitted in support of the warrant failed to establish that the police had probable cause to believe that evidence of either of those crimes would be found in the residence. The state, in response, argues that the affidavit at least established probable cause that defendant was knowingly permitting persons to unlawfully keep or sell controlled substances at his residence-the offense defined in ORS 167.222 -and that evidence of that offense would be found in his residence. We agree with defendant and therefore reverse and remand.
In February 2014, Corporal Joshua Zundel of the Seaside Police Department applied for a warrant to search, among other places, a house on Alameda Street in Astoria, Oregon. In Zundel's affidavit in support of the warrant, he averred that 30 days prior to the warrant affidavit, a confidential reliable informant (CRI) had purchased an undisclosed amount of heroin from a dealer named McGee at the Alameda house, which is described as a "3-story red house" with a driveway on the west side of the building and *491 the main entrance on the east side. The affidavit explains that the same CRI used in the McGee controlled buy also engaged in a controlled buy of heroin from another dealer, Konecny, 96 hours prior to the warrant affidavit, also at the Alameda house. Neither Konecny, nor McGee, nor the CRI were residents of the Alameda Street property.
The affidavit asserts that the CRI had purchased heroin from McGee on at least 20 previous occasions, none of which were identified as being at the Alameda house. The affidavit also contains information regarding two other controlled buys conducted by the CRI under the supervision of *905 Zundel: one out of McGee's car at an undisclosed location in Clatsop County, and the other at a residence in Chinook, Washington, Pacific County.
The affidavit states that, within the last 30 days, the CRI contacted McGee about the purchase of heroin, and they agreed to meet at the Alameda house, although it does not disclose who suggested the location. Detectives observed the CRI arrive at the house, and the CRI returned with a baggie containing heroin. There is no information about who, if anyone, let the CRI into the house. The amount of heroin and the purchase price are also not disclosed in the affidavit.
With respect to the Konecny buy, the affidavit notes that the CRI had previously purchased heroin at least 15 times from Konecny, though none of those previous buys were identified as having occurred at the Alameda house. In describing the controlled buy with Konecny, the affidavit states that the CRI contacted Konecny and arranged for the purchase of heroin, but like with the McGee buy, does not disclose who suggested the location. Detectives observed the CRI arrive at the house and meet with Konecny, but the affidavit does not disclose who, if anyone, let the CRI and Konecny into the house. The CRI then returned and provided detectives with a baggie containing a substance that was determined to be heroin. Again, the affidavit does not disclose the amount of heroin that was purchased or the purchase price.
Defendant, though not identified as the subject of the drug-trafficking investigation, is identified as a resident of the Alameda house where the two controlled buys occurred. And the affidavit states that the CRI reported to detectives that defendant was present at the Alameda house during those controlled buys. The affidavit states that during the Konecny buy, the CRI informed detectives that defendant and another individual, Johnson, were "at the residence when the drugs were being sold"; it further states that the detectives "know these subjects to be known drug users." With regard to the McGee buy, the affidavit states that the CRI informed detectives that defendant, Johnson, and another individual, Sheker, were "at the residence when *906 the drugs were being sold," and that the detectives "know these subjects to be known drug users." The affidavit does not, however, indicate that either defendant or Johnson were present in the room when the buys occurred or knew that the CRI or either dealer were present in the house.
Zundel's affidavit summarized that he believed that Konecny and McGee were in violation of ORS 475.850, delivery of heroin, and ORS 167.222, frequenting a place where controlled substances are used, and that they were involved in an ongoing basis in distributing heroin. He also averred that, based on his training and experience, evidence of crimes in violation of ORS 475.850, delivery of heroin, are often kept for long periods of time "in locations controlled or accessed by drug-traffickers where they have engaged with others in long-term, on-going drug-trafficking activities." Zundel averred that such evidence includes "heroin and other controlled substances commonly maintained within the address and telephone numbers of their associates in the trafficking organization," "caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, stolen property and other items of value and/ or proceeds of drug transactions," "firearms for use in protecting their drugs," "books, records, notes, ledgers, airline tickets *** and other papers that narcotics traffickers obtain and possess relative to the transportation, ordering, sale, and distribution of controlled substances," and "digital scales, balancing scales, and any other weighing devices." Zundel's affidavit requested *492 permission to search Konecny's residence, McGee's vehicle, and defendant's residence on Alameda.
Based on Zundel's affidavit, a magistrate issued a warrant to search the Alameda house for evidence related to an ongoing drug distribution enterprise, including:
"backpacks, safes, lockboxes and their stored content, storing and packaging materials, scales, Heroin, and other controlled substances, stolen items, weapons, financial records, drug records, evidence of cash expenditures, pagers and cellular phones and their stored contents, information disclosing identifications, locations, and activities of co-conspirators, phone lists, travel documents, drug packaging materials, trace amounts of Heroin, stolen property as well as other items which are also evidence, fruits, *907 and tools of drug trafficking in violation of ORS 475.850 DCS-Heroin and ORS 167.222 Frequenting a Place where Controlled Substances are used."
The ensuing search yielded the drug-related evidence that was the basis of the charges against defendant.
Before the trial court, defendant moved to suppress the evidence obtained during the search of his residence, arguing that there was not probable cause to search his residence. The state defended the warrant, arguing solely that the affidavit established probable cause of a violation of ORS 475.850, delivery of heroin. No arguments before the trial court addressed the second crime alleged in the warrant, ORS 167.222, frequenting a place where controlled substances are used. Following the trial court's denial of the motion to suppress, defendant proceeded to trial and was found guilty of unlawful manufacture of marijuana, unlawful possession of heroin, and unlawful possession of a short-barreled firearm. Defendant was acquitted of unlawful possession of methamphetamine.
On appeal, defendant assigns error to the denial of his motion to suppress, again arguing that Zundel's affidavit did not contain information sufficient to establish that it was more likely than not that the defendant's residence would contain evidence of ORS 475.850, delivery of heroin. However, on appeal, the state shifts tactics and offers no defense of the affidavit as establishing probable cause for ORS 475.850. Instead, the state focuses on the crime of frequenting a place where controlled substances are used, arguing that the affidavit set forth sufficient facts to establish probable cause of a violation of ORS 167.222, and that evidence of that crime would be found in the residence.
Because search warrants are presumptively valid, it is a defendant's burden to establish that the warrant was defective. State v. Webber , 281 Or. App. 342, 347, 383 P.3d 951 (2016). We review a magistrate's determination of probable cause supporting a warrant for legal error. State v. Castilleja , 345 Or. 255, 263-64, 192 P.3d 1283, adh'd to on recons , 345 Or. 473, 198 P.3d 937 (2008). Probable cause exists when the facts, as set forth in the affidavit, along with any reasonable inferences, could "permit a neutral and detached *908 magistrate to determine that seizable evidence probably would be found at the place to be searched[.]" Id. at 269, 192 P.3d 1283 ; State v. Foster , 233 Or. App. 135, 140-41, 225 P.3d 830 (2010), aff'd , 350 Or. 161, 252 P.3d 292 (2011). The facts of the affidavit must therefore establish a nexus between three things: (1) that a crime has been, or is currently being, committed, and that (2) evidence of that crime (3) will be found in the place to be searched.
Whether that nexus has been established by the affidavit is judged by the standard of probable cause, i.e. , more likely than not, which is less than a certainty, but more than a mere possibility. State v. Wilson , 178 Or. App. 163, 167, 35 P.3d 1111 (2001) (probable cause requires "more than a mere possibility, but less than a certainty (citation omitted)"); Foster , 233 Or. App. at 141, 225 P.3d 830 ("Probably means more likely than not." (Internal quotation marks omitted.) ). In reviewing a judge's determination that a warrant is supported by probable cause, we examine the information in the supporting affidavit in a commonsense and realistic fashion, considering both the facts recited and the reasonable inferences that can be drawn from them. State v. Daniels , 234 Or. App. 533, 538, 228 P.3d 695, rev. den. , *493 349 Or. 171, 243 P.3d 70 (2010). We resolve "doubtful cases *** in favor of allowing the warrant." Id. at 538, 228 P.3d 695.
With that standard in mind, we turn to the affidavit in this case. As described above, Zundel applied for the warrant to search defendant's residence for, among other things, evidence of a violation of ORS 475.850, delivery of controlled substance-specifically, heroin. And, as noted, the state on appeal does not develop any argument that the affidavit established probable cause to believe that evidence of that crime would be found at the Alameda house. To the extent that the state has abandoned any reliance on probable cause of delivery of heroin, that decision is warranted on this record.
The facts do not establish probable cause to believe that evidence of ongoing drug enterprise activity would be at the residence. We have long held that drug evidence is prone to staleness.
*909 State v. Chase , 219 Or. App. 387, 393, 182 P.3d 274 (2008) ; see also State v. Ingram , 251 Or. 324, 328, 445 P.2d 503 (1968). Staleness is an important factor when considering probable cause, because "probable cause must exist at the time the order is issued." State v. Mituniewicz , 186 Or. App. 95, 104, 62 P.3d 417, rev. den. , 335 Or. 578, 74 P.3d 112 (2003). We have considered five factors when determining staleness: (1) the length of time; (2) the "perishability" versus the durability of the item; (3) the mobility of the evidence; (4) the "nonexplicity inculpatory character" of the evidence; and (5) the "propensity of an individual suspect or general class of offenders to maintain and retain possession of such evidence." State v. Ulizzi , 246 Or. App. 430, 438-39, 266 P.3d 139 (2011), rev. den. , 351 Or. 649, 275 P.3d 968 (2012).
In State v. Kittredge/Anderson , 36 Or. App. 603, 585 P.2d 423 (1978), we found information as little as 96 hours old to be too stale to establish probable cause to issue a search warrant. 36 Or. App. at 607, 585 P.2d 423. There, a confidential reliable informant had witnessed an undisclosed amount of marijuana at the defendant's residence within 96 hours of affidavit. Id. at 606, 585 P.2d 423. Because the affidavit provided no information on how much was seen, who possessed it, or who normally occupied the house, the court found that the affidavit did not provide probable cause. Id. at 606-07, 585 P.2d 423.
Heroin, in particular, is a substance that is highly transportable and can be consumed in a small amount of time. State v. Corpus-Ruiz , 127 Or. App. 666, 670, 874 P.2d 90 (1994). Because of its easy transportability, past possession of the drug by a visitor on the premises does not create the same inference regarding present possession as might be available in the case of a resident's possession. Kittredge , 36 Or. App. at 606, 585 P.2d 423 ("Possession of contraband by one who lives in a place, as opposed to possession by one who is merely a visitor on the premises, gives rise to a stronger inference that the drug is still there at a later time.").
Here, the affidavit established that two drug dealers, McGee and Konecny-neither identified as a resident of the Alameda house or described in the affidavit as having any relationship to the house beyond the single buy-engaged in a single drug transaction at that house on separate *910 occasions, the most recent of which was 96 hours earlier. Critically, the affidavit does not say who suggested that the buys occur at the Alameda house. It is therefore just as likely that the location was suggested by the CRI as either of the dealers. The CRI present for each of those buys does not describe observing any indications of ongoing drug activity at the house. There is no description of additional amounts of narcotics beyond what was passed in the two transactions, nor any description of large quantities of cash, scales, baggies, or other items commonly associated with ongoing narcotics enterprises. The only observed narcotics come from the two discrete buys, but, as in Kittredge , past possession of an unknown amount of a transportable and consumable drug by a visitor is not sufficient to establish that the drug probably will be found at the residence four days later.
Even though Zundel averred that, in his training and experience, records and other evidence are often kept for long periods of time "in locations controlled or accessed by drug-traffickers where they have engaged with others in long-term, on-going drug-trafficking *494 activities," the facts in the affidavit fail to establish the necessary predicate on which he relies: that the dealers, McGee and Konecny, engaged with defendant or anyone else at the house in "ongoing high volume" drug trafficking. See Webber , 281 Or. App. at 351-57, 383 P.3d 951 (explaining that training and experience is examined on a case-by-case basis and that it is not an invocation or incantation that will supply probable cause where the affidavit itself "did not suggest that defendant was engaged in the sort of ongoing, high-volume drug operation that has, in previous cases, supported the inference that additional evidence of drug activity will be found in other, specific, locations"); see also State v. Miller , 254 Or. App. 514, 528, 295 P.3d 158 (2013) (officer's training and experience was unhelpful to shoring up warrant affidavit for dealer's residence when training and experience was related to dealer practice of keeping incriminating items in their residences, explaining "[n]one of those generic averments * * * establishes that, where a person is using a vehicle to engage in drug transactions, evidence of possession, manufacturing, or distribution is likely to be located in his or her residence" (emphasis in original omitted) ). *911 In sum, we agree with defendant that the affidavit fails to establish probable cause to believe that evidence of the crime of delivery of heroin would be found at defendant's residence. We therefore focus the remainder of our discussion, as does the state, on whether the affidavit established probable cause to believe that the house contained evidence of the second crime of investigation: frequenting a place where drugs are sold or used. Before we can determine if probable cause existed, we must first determine what the statute prohibits, and we do that by employing our traditional statutory analysis focusing on the text, context, and legislative history. State v. Gaines , 346 Or. 160, 164, 206 P.3d 1042 (2009).[1]
ORS 167.222 provides:
"A person commits the offense of frequenting a place where controlled substances are used if the person keeps, maintains, frequents, or remains at a place, while knowingly permitting persons to use controlled substances in such place or to keep or sell them in violation of ORS 475.005 to 475.285 and 475.752 to 475.980."
A person can fall under the prohibitions of ORS 167.222 through four actions-keeping, maintaining, frequenting, or remaining. Of those four, only one is defined within the statute itself. ORS 167.222(4) states that "[a]s used in this section, 'frequents' means repeatedly or habitually visits, goes to or resorts to." By defining frequenting as "habitually" visiting, the legislature indicated that it views this statute as targeting repeated, ongoing, and persistent activity. That is supported by the plain and ordinary meaning of the other actions. Webster's defines "to remain" as "to stay in the same place or with the same person *** [to] reside, dwell." Webster's Third New Int'l Dictionary 1919 (unabridged ed. 2002). To keep is defined as "to maintain *** to retain or continue to have in one's possession or *912 power." Id. at 1235. To maintain is defined as "to keep in a state *** to sustain *** to preserve." Id . at 1362. Thus, it is clear from the plain and ordinary meaning of these terms that the legislature intended the statute to proscribe actions at the location over a period of time, not transitory activity.
The second clause of ORS 167.222 requires that any of the four actions-frequenting, keeping, maintaining, or remaining-be done with a concurrent purpose. The actor must do so while "knowingly permitting persons to use controlled substances in such place or to keep or sell them in violation of ORS 475.005 to 475.285 and 475.752 to 475.980."
In State v. Pyritz , 90 Or. App. 601, 605, 752 P.2d 1310 (1988), we held that "permit"
*495 means "to allow by tacit consent or by not hindering, taking no steps to prevent, or to grant leave by express consent or authorization." (Quoting Lemery v. Leonard , 99 Or. 670, 678, 196 P. 376 (1921) ). There, we noted:
"In ORS 167.222, 'permitting' means one who, (1) having legal authority over persons who use, keep, or sell illegal controlled substances, at the specified place where the defendant frequents or remains, (2) authorizes or consents to such use, possession, or sale. This definition of 'permit' merely makes express what was implied in earlier cases defining 'permit:' Before one can be said to 'permit' something, one must have the authority to forbid it."
Pyritz , 90 Or. App. at 605, 752 P.2d 1310 (footnote omitted). Thus, one must have a relationship to the premises that gives one a legal authority over the location.
Additionally, ORS 167.222 ascribes the mental state of "knowingly" to the act of permitting. ORS 161.085(8) defines "knowingly" as acting "with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." Knowingly, thus, refers to an actual , not merely constructive, awareness of conduct. State v. Barnes , 329 Or. 327, 337, 986 P.2d 1160 (1999) ; State v. Rogers , 185 Or. App. 141, 144, 59 P.3d 524 (2002) ; State v. Mayer , 146 Or. App. 86, 90, 932 P.2d 570 (1997).
Finally, a review of the legislative history of the statute shows that the legislative intent behind ORS 167.222 *913 is that the "place" where the "use or sale" is being permitted is a particular type of place-possessed of a nature similar to an ongoing commercial drug enterprise, and not a place for one-off or occasional use. ORS 167.222 derives from Oregon's historical opium den statute, which can be traced back to at least 1887, where the Oregon Supreme Court first interpreted it:
"The statute defining this crime is as follows: 'It shall be unlawful for any person to frequent an opium den for the purpose of purchasing or smoking opium, or any preparation in which opium is the principal medicinal agent.' Sp.Sess. 1885, § 4, p. 39. And section 3 defines an opium den thus: 'Any building where opium is sold for the purpose of being smoked on or about the premises, or where the same is smoked, shall be considered an opium den.' "
State v. Sam , 14 Or. 347, 347-48, 13 P. 303 (1887).
The modern version of ORS 167.222 originated in 1935. See Oregon Code title XV, ch. 8, § 15-823 (1935). The 1935 version of the law was aimed at drug houses described as a common nuisance. The statute read:
"Common Nuisance-Any store, shop, warehouse, dwelling house, building, vehicle, boat, aircraft, or any place whatever, which is resorted to by narcotic drug addicts for the purpose of using narcotic drugs or which is used for the illegal keeping or selling of the same, shall be deemed a common nuisance. No person shall keep or maintain such a common nuisance."
Id .
In 1953, the statute was codified as former ORS 474.130 (1953). Thereafter, in 1957, former ORS 474.130 was amended by Oregon Laws 1957, chapter 587, section 4. This amendment subdivided the statute into subsections (1) and (2) and added subsection (3). That statute read:
"(1) Any store, shop, warehouse, dwelling house, building, vehicle, boat, aircraft, or any place whatever, which is resorted to by narcotic drug addicts for the purpose of using narcotic drugs or which is used for the illegal keeping or selling of the same, shall be deemed a common nuisance and shall be abated in the manner provided in ORS 471.630 to 471.655.
*914 "(2) No person shall keep or maintain such a common nuisance.
"(3) No person shall frequent any place if he knows it to be a place of the type described in subsection (1) of this section."
ORS 474.130 (1957) (emphasis added).
In 1971, the legislature deleted former ORS 474.130(2) and (3), Or. Laws 1971, ch. 743, § 376, and enacted ORS 167.222, Or. Laws 1972, ch. 743, § 277. That statute, which was captioned "Criminal Drug Promotion," closely resembles the modern version:
*496 "(1) A person commits the crime of criminal drug promotion if he knowingly maintains, frequents, or remains at a place:
"(a) Resorted to by drug users for the purpose of unlawfully using narcotic or dangerous drugs; or
"(b) Which is used for the unlawful keeping or sale of narcotic or dangerous drugs."
ORS 167.222 (1971).
This court interpreted the statute in State v. Smith , 31 Or. App. 749, 755, 571 P.2d 542 (1977). There, we held that the purpose of the statute had remained unchanged since its opium den days, and required the place to be of a type where a principal or substantial purpose is the commercial sale or use of illegal drugs :
"This statutory evolution indicates that the legislature has made changes in the prohibited conduct, e.g. , adding 'remains' to 'frequents' but has been consistent about the nature of the place in which such conduct is prohibited. It is not a crime to remain in any place, but only, as most clearly stated in former ORS 474.130(3) after the 1957 amendment, a certain 'type' of place. Interpreted in light of its historical antecedents set out above, we conclude ORS 167.222 prohibits knowingly remaining in a place where a principal or substantial purpose is the commercial sale or use of illegal drugs . In other words, we interpret ORS 167.222 as a modern version of the statute involved in State v. Sam , 14 Or. 347, 13 P. 303 (1887), which prohibited frequenting 'an opium den.' "
*915 Smith , 31 Or. App. at 754-55, 571 P.2d 542 (emphasis added); see also State v. Gonzalez-Valenzuela , 358 Or. 451, 473, 365 P.3d 116 (2015) (where the Oregon Supreme Court recently examined Smith , and relied, in part, on its reasoning to interpret ORS 163.575(1)(b) to similarly require, for that statute, that the place be "where a principal or substantial use of the place is to facilitate unlawful drug activity").
The last statutory change relevant to our analysis occurred in 1979, when the statute was renamed to "frequenting a place where drugs are used," Or. Laws 1979, ch. 641, largely to make it more palatable for a defendant to plead guilty. "[I]t's merely a matter of making it easier to convict people on a plea bargaining basis. People would be more willing to plea bargain to frequenting than they would be to criminal drug promotion." Tape Recording, Senate Committee on Judiciary, HB 2238, May 22, 1979, Tape 44, Side 1 (statements of Sen. Stephen Kafoury). "By changing the name it would make it sound not quite so onerous." Tape Recording, Senate Committee on Judiciary, HB 2238, May 22, 1979, Tape 44, Side 1 (statements of Sen. Jan Wyers). It is clear, however, as evidenced by the legislative history, including the recitation of the state of the law at that time by Senator Kafoury, that the legislature did not intend to change the substance of the law or alter its focus on places where a principal or substantial purpose is the commercial sale or use of illegal drugs. See, e.g. , Tape Recording, House Committee on Judiciary, HB 2238, Apr. 10, 1979, Tape 42, Side 1 (statement of Sen. Stephen Kafoury).
Having reviewed the text, context, and history of ORS 167.222, we conclude that, to commit the crime of frequenting a place where controlled substances are used, a person with the legal authority over the location must knowingly permit, through affirmative or tacit authorization or consent, the use, possession, or sale of the controlled substances at the location where a principal or substantial purpose is the commercial sale or use of illegal drugs. To knowingly permit, it is not enough that the person should have known the controlled substances were used at the location, he or she must have actually known .
*916 Accordingly, for the warrant to be valid in this case, the affidavit had to establish that there was probable cause to believe-i.e. , it was more likely than not-that (1) someone with legal authority over the Alameda house actually knew of the sale of drugs at the residence and authorized or consented to the use of the house to facilitate those sales, (2) the Alameda house was a location where a principal or substantial purpose was the commercial sale or use of illegal drugs, and (3) evidence of that crime, ORS 167.222, not merely the deals themselves, would be found *497 in the residence. See Foster , 233 Or. App. at 141, 225 P.3d 830 ("A magistrate may issue a search warrant if there is probable cause to believe that the search will discover things specified in the application and subject to seizure[.] *** Probably means more likely than not." (Brackets in original; internal quotation marks and citations omitted.) ).
In examining the affidavit, it is readily apparent that the persons of inquiry for the investigating officer are McGee and Konecny-the dealers. However, on these facts, their single visits to the Alameda house do not meet the standard of "frequenting" as defined in the statute, i.e. , "habitually" visiting, nor "remaining," since each dealer's visit to the house was transitory and for a limited duration. Similarly, on these facts, neither can they be subject to the statute under theories of "maintaining" or "keeping." Nothing in the affidavit establishes that either McGee or Konecny had control over the Alameda house, and no facts show that defendant or the other residents in the Alameda house were criminal associates of either Konecny or McGee. Both were simply dealers who appeared at the house once to conduct a transaction and then left. As discussed above, ORS 167.222 requires a relationship of legal authority between the individual and location. Based on the affidavit, McGee or Konecny are not the proper subject of inquiry for ORS 167.222 because, as mere visitors to the Alameda house, they do not possess the legal authority over the location, and cannot, as a matter of law, violate ORS 167.222.[2]
*917 Despite the fact that the affidavit incorrectly attempts to establish probable cause of a violation of ORS 167.222 by McGee and Konecny, it may still survive scrutiny if it establishes probable cause that someone committed a violation of ORS 167.222. We therefore examine whether the facts, as set forth in the affidavit, make it more likely than not that someone with authority over the Alameda house knowingly permitted the sale of drugs at the residence.
The only person with authority over the Alameda house mentioned in the affidavit is defendant. The CRI who conducted the controlled buy at the Alameda house informed detectives that defendant was "at the residence" at the time of the buys, but did not specify where defendant was in the house. Those facts must be viewed in the context of the affidavit as a whole, including the fact that the Alameda house is described as a "3-story house." As to his presence during the deals, the affidavit gives no information as to whether defendant allowed either the dealers or the CRI to enter the house; whether defendant talked to the CRI on the phone; whether defendant arranged the sale; or whether defendant was even present in the part of the house in which the controlled buys occurred. In short, while the affidavit describes defendant as being at the house, there is nothing in the affidavit indicating he knew of the two deals.
Nor are we certain that the number of deals-in this case two over the course of 30 days-makes it more likely than not that someone residing at the Alameda house would have actual knowledge that the house was being used to facilitate those deals. Again, it is not enough that a person should have known. ORS 167.222 requires that they did know and permitted the drug use or sale at the location. But, critically, even if two discrete deals over 30 days would suffice for probable cause of actual knowledge, it is insufficient for probable cause that the Alameda house was a place where a principal or substantial purpose was the commercial sale or use of illegal drugs. As discussed earlier, the affidavit in this case fails to establish probable cause of delivery because it does not establish that the dealers, McGee and Konecny, engaged with defendant or anyone else at the house in ongoing drug trafficking. Webber , 281 Or. App. at 351, 383 P.3d 951. On these facts, it follows that if drug activity is not *918 established for probable cause of delivery, then the affidavit also fails to establish that the sale of drugs at the Alameda house was of a nature such as to make the house a location where a principal *498 or substantial purpose is the commercial sale or use of illegal drugs.
We therefore conclude that the facts set forth in Zundel's affidavit failed to establish probable cause under ORS 167.222. Consequently, neither of the bases for issuing the warrant to search defendant's residence was supported by probable cause, and the trial court should have granted defendant's motion to suppress evidence that resulted from that search. Accordingly, we reverse defendant's convictions, which were based on that evidence, and remand for further proceedings.
Reversed and remanded.

On appeal, neither party squarely addresses the argument of their opponent. Defendant focuses his brief on delivery. The state focuses on frequenting, and defendant did not file a reply brief addressing that new theory. Perhaps because they are ships passing in the night, neither party presents this court with a statutory analysis of ORS 167.222. However, since the state's defense of the warrant rests solely on that statute, we must determine its meaning. Stull v. Hoke , 326 Or. 72, 77, 948 P.2d 722 (1997).

The affidavit did include Konecny's own residence and McGee's vehicle as locations to be searched, and to those locations, ORS 167.222 could apply because those are locations that Konecny and McGee do have authority to permit or prohibit the actions described in ORS 167.222.